NO. 07-05-0404-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



JANUARY 17, 2006



______________________________


 

BRETT THOMAS BAIRD, APPELLANT



V.



THE STATE OF TEXAS, APPELLEE


_________________________________



FROM THE COUNTY CRIMINAL COURT #3 OF DENTON COUNTY;



NO. 2004-09096-C; HONORABLE DAVID D. GARCIA, JUDGE


_______________________________




Before REAVIS and CAMPBELL and HANCOCK, JJ.

ON ABATEMENT AND REMAND


 Appellant Brett Thomas Baird has given notice of appeal from a Judgment of
Community Supervision for the offense of Duty on Striking Fixture or Highway Landscaping. 
The appellate court clerk received and filed the trial court clerk's record on September 23,
2005. The trial court reporter's record was filed on November 15, 2005. 

 By letter dated December 28, 2005, the appellate clerk reminded counsel for
appellant that appellant's brief was due on December 15, 2005, and that neither the brief
nor a motion for a further extension of time had been received. Counsel for appellant was
further advised by such letter that if no response to the letter was received by January 6,
2006, the appeal would be abated to the trial court for hearing pursuant to Rule of Appellate
Procedure 38.8(b). No response has been received. 

 Accordingly, this appeal is abated and the cause is remanded to the trial court. Tex.
R. App. P. 38.8(b)(2). Upon remand, the judge of the trial court is directed to immediately
cause notice to be given of and to conduct a hearing to determine: 

 (1) whether appellant desires to prosecute this appeal; 


 if appellant desires to prosecute this appeal, then whether appellant
is indigent, and if not indigent, whether counsel for appellant has
abandoned the appeal; 
 if appellant desires to prosecute this appeal, whether appellant's
present counsel should be replaced; and
 what orders, if any, should be entered to assure the filing of
appropriate notices and documentation to dismiss appellant's appeal
if appellant does not desire to prosecute this appeal, or, if appellant
desires to prosecute this appeal, to assure that the appeal will be
diligently pursued.



If the trial court determines that the present attorney for appellant should be replaced, the
court should cause the clerk of this court to be furnished the name, address, and State Bar
of Texas identification number of the newly-appointed or newly-retained attorney. 

 In support of its determination, the trial court shall prepare and file written findings
of fact and conclusions of law and cause them to be included in a supplemental clerk's
record. The hearing proceedings shall be transcribed and included in a supplemental 

reporter's record. Those supplemental records shall be submitted to the clerk of this court
no later than February 17, 2006.


 Per Curiam





Do not publish. 




 therefore the
report does not constitute a good faith effort to meet the requirements of
4590i, Section 13.01 . . . .

 THE COURT HEREBY MODIFIES ANY PREVIOUS RULINGS TO THE
CONTRARY, AND IT IS THEREFORE ORDERED, ADJUDGED AND
DECREED that the Motion to Dismiss of Michael Graves, M.D.[,] is granted.
The claims to [sic] which Plaintiffs make against . . . Graves . . . are hereby
ordered dismissed with prejudice.


(Emphasis added). As can be seen, the trial court expressed in its order that it considered
the §13.01 motion of Graves. So too did it conclude that, under §13.01, the opinions of
Bresler were "conclusory." While it did not then expressly state that it granted the particular
motion encompassing the §13.01 ground, one can nonetheless reasonably conclude from
the context of the order that the Gonzales' failure to comply with art. 4590i, §13.01 was one
of two bases on which the trial court dismissed the suit. We next turn to the allegation that
Bresler's report was not conclusory. According to statute, one suing another for medical
malpractice must 

 [n]ot later than the later of the 180th day after the date on which a health care
liability claim is filed or the last day of any extended period . . . (1) furnish to
counsel for each physician . . . one or more expert reports, with a curriculum
vitae of each expert listed in the report; or (2) voluntarily nonsuit the action
against the physician. . . .

Tex. Rev. Civ. Stat. Ann. art. 4590i, §13.01(d) (Vernon Supp. 2003). (1) Should the plaintiff
fail in that regard, then the trial court must

 . . . on the motion of the affected physician . . ., enter an order awarding as
sanctions against the claimant or the claimant's attorney: (1) the reasonable
attorney's fees and costs of court incurred by that defendant; (2) the forfeiture
of any cost bond respecting the claimant's claim against that defendant to the
extent necessary to pay the award; and (3) the dismissal of the action of the
claimant against that defendant with prejudice to the claim's refiling. 

Id. §13.01(e); Jernigan v. Langley, 111 S.W.3d 153, 156 (Tex. 2003) (stating that the cause
must be dismissed if the trial court determines that the report does not represent a good
faith effort to comply with the definition of an expert report); Kirksey v. Marupudi, ___
S.W.3d ___, No. 07-03-076-CV, 2003 Tex. App. Lexis 10852 at 3 (Tex. App.-Amarillo
December 30, 2003, no pet.). 

 Next, to be adequate, the report must be written by an expert and provide a fair
summary of that expert's opinions regarding the applicable standards of care, the manner
in which the care rendered deviated from those standards, and the causal relationship
between the deviation and the injury allegedly suffered. Id.§13.01(r)(6); Kirksey v.
Marupudi, 2003 Tex. App. Lexis 10852 at 4; Chisholm v. Maron, 63 S.W.3d 903, 906 (Tex.
App.--Amarillo 2001, no pet.). In other words, the expert must do more than merely voice
his opinions in the report. Kirksey v. Marupudi, 2003 Tex. App. Lexis 10852 at 4. He is
obligated to also inform the defendant of the specific conduct called into question and
provide a basis for the trial court to conclude that the claims have merit. American
Transitional Care Ctrs. of Tex. Inc. v. Palacios, 46 S.W.3d 873, 879 (Tex. 2001); Kirksey
v. Marupudi, 2003 Tex. App. Lexis 10852 at 4; Chisholm v. Maron, 63 S.W.3d at 906. And,
though this does not require the claimant to marshal all his evidence, Rittmer v. Garza, 65
S.W.3d 718, 723 (Tex. App.--Houston [14th Dist.] 2001, no pet.), more than mere
conclusions about the standard of care, its breach, and causation must be uttered. 
American Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d at 879; Kirksey v.
Marupudi, 2003 Tex. App. Lexis 10852 at 4. Finally, in assessing the adequacy of the
report, the trial court can look no further than to the four corners of the report. Bowie
Memorial Hospital v. Wright, 79 S.W.3d 48, 52 (Tex. 2002); American Transitional Care
Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d at 878; Kirksey v. Marupudi, 2003 Tex. App. Lexis
10852 at 5. With this said, we turn to the report submitted by Bresler, the Gonzales' expert.

 In it, Bresler describes the condition of Isaac Gonzales when he first appeared for
treatment at the emergency room of Hi-Plains Hospital. At the time, Isaac complained of
back pain, abdominal pain, slight wheezing, and shortness of breath. His appearance and
vital signs at the time were also described, as was the medication prescribed to him by the
emergency room physician. Thereafter, according to the report, Isaac was discharged and
referred to a urologist for examination. The referring doctor apparently thought a urological
examination was needed because Isaac had "tumors in his right scrotal sac." Graves was
the urologist to whom Isaac was referred. 

 Upon appearing at Graves' office, Isaac underwent an "intravenous pyelogram, which
was essentially unremarkable." Graves also advised Isaac "to have the scrotal tumors
resected at some time in the future." 

 Within 52 hours of first visiting the emergency room and Graves, Isaac attempted to
return to it. He had again experienced abdominal pain "and passed out in the car on the
way to the hospital." He "was found in cardiac arrest and could not be resuscitated." The
cause of death was "'bronchopneumonia with left empyema," according to the report. 

 Gonzales sued Graves contending that he provided Isaac an "incomplete medical
assessment" and failed "to properly diagnose and . . . treat" him. In addressing the conduct
of Graves purportedly evincing this lack of care (as opposed to that of the emergency room
physician and nurse), Bresler stated in his report no more than what follows:

 Records provided to me from the Urologist . . . do not reveal documentation
of a thorough history and physical as would be expected. Based on
documentation of [Isaac's] symptoms in the Emergency Department on Feb
25, 1999 and documentation of his condition upon return to the Emergency
Department approximately 52 hrs later in worse condition, it would be
reasonable the [sic] conclude his symptoms had not significantly improved at
the time he was examined by the urologist on Feb 26, 1999.


 The complaints [Isaac] presented with were not adequately addressed thus
falling below the standard of care. [Isaac] likely would have survived his
illness had it been diagnosed and treated in a timely manner.


 Based on my experience, medical knowledge and training in addition to the
medical records provided to me, it is my opinion to a reasonable degree of
medical certainty that failure to diagnose and treat Mr. Gonzales['] pulmonary
abnormalities was the proximate cause of his death.


As can be seen, Bresler did use the term "standard of care" in his report. Yet, what it was
goes unmentioned. We are left to guess at whether any standard of care obligates a
urologist to diagnose a patient's lung condition (pneumonia) when the patient is referred to
the doctor simply for purposes of examining tumors appearing on the patient's scrotum. 
And, we are not in a position to hold, as a matter of law, that physicians have the duty to
diagnose ailments other than and completely unrelated to those for which the patient was
originally referred to the doctor. 

 Furthermore, Bresler's statement that the records provided him did "not reveal
documentation of a thorough history and physical as would be expected" falls short of filling
the void. Simply put, what an expert may expect may well differ from what is required by
the applicable standard of care. Just as there are many ways to skin a cat (as the old
adage says), there may well be many ways to address an ailment. And, that one doctor
may have followed a particular path had he been the attending physician does not mean
that the path he would have followed represents the standard of care. See Whittley v.
Heston, 954 S.W.2d 119, 123 (Tex. App.-San Antonio 1997, no pet.) (holding that a
testifying expert cannot establish the standard of care by simply stating the course of action
he would have taken under the same or similar circumstances); Warner v. Hurt, 834 S.W.2d
404, 407 (Tex. App.-Houston [14th Dist.] 1992, no writ (holding the same); Stanton v.
Westbrook, 598 S.W.2d 331, 333 (Tex. Civ. App.-Houston [14th Dist.] 1980, writ ref'd n.r.e)
(holding the same). In other words, the physician must specify what the standard of care
is, not what he would have done. Similarly, we deduce from Whittley, Warner, and Stanton
that just because a physician opines that he expects something to be done does not define
what the standard of care is; nor does it mean that what he would expect is what the
standard requires to be done. In short, the standard of care is not subjective but objective
and founded upon what a reasonable practitioner would have done under the same or
similar circumstances. See Schneider v. Haws, 118 S.W.3d 886, 890 (Tex. App.--Amarillo
2003, no pet.) (stating that a doctor need only exercise ordinary or reasonable care and skill
under the circumstances). And, Bresler fails to specify what is required of a reasonable
practitioner under the circumstances confronting Graves. 

 Yet, even if the report could be construed as specifying a standard of care and that
the standard obligated Graves to take a history of Isaac and subject him to a physical
examination, question remains as to whether Graves did that. Nothing in the report says
that he did not and, again, we are limited to perusing the report. Rather, Bresler opines that
the records given him did "not reveal documentation of a thorough history and physical." 
(Emphasis added). That Bresler did not find documentation of a history and physical is not
to say that neither a history nor physical were taken. 

 Moreover, and assuming arguendo that the standard of care required Graves to take
a history of Isaac and subject him to a physical, and that he did not do either, another
problem arises. Logic dictates that discovery of an ailment based upon an examination of
a patient means little without explanation of what the standard of care demands once the
ailment is discovered, and Bresler said nothing about that. At most, he merely suggests
that the complaints of Isaac "were not adequately addressed." According to the Supreme
Court in Palacios, whether a doctor breached his duty to a patient "cannot be determined
absent specific information about what the defendant should have done differently." 
American Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d at 880. And, Bresler
failed to inform those reading his report about what, if anything, should have been done to
address Isaac's complaints pursuant to the unspecified standard of care. Thus, his report
was indeed conclusory in this regard.

 Similarly unexplained is the link between Graves' purported default and Isaac's
death. It is not enough to merely state, as Bresler did here, that the failure to diagnose
Isaac's pneumonia was the proximate cause of his death. See Bowie Memorial Hospital
v. Wright, 79 S.W.3d 48, 53 (Tex. 2002) (holding that the causal relationship between the
default and injury must be explained for the report to comply with §13.01(d)).

 In sum, Bresler's report is not the fair summary of an expert's opinions regarding the
applicable standards of care, the manner in which the care rendered deviated from those
standards, and the causal relationship between the deviation and the injury allegedly
suffered, as demanded by the Supreme Court in Palacios or this court in Kirksey, or
Chisolm. Various of the elements needed to make the report adequate go unmentioned
while others are alluded to in a conclusory fashion. Thus, Gonzales did not comply with art.
4590i, §13.01(d) of the Texas Revised Civil Statutes, and the trial court did not err in
dismissing the suit per §13.01(e) of the same statute. 

 Having found at least one ground upon which the trial court relied to justify dismissal,
we affirm the order of dismissal.


 Brian Quinn

 Justice



 
1. As of September 1, 2003, the provision is now found at §73.351 of the Civil Practice and Remedies
Code. Furthermore, the claimant no longer has 180 days to serve the report but only 120. Tex. Civ. Prac.
& Rem. Code Ann. §74.351(a) (Vernon Supp. 2004). However, because the trial court dismissed the suit
before September 1, 2003, we cite to the old statute.